Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: § | | |
| § | Case No. 22-31641-mvl7 | |
| GOODMAN NETWORKS, INC., § | | |
| § | (Chapter 7) | |
| Debtor. § | | |
| § | | |
| SCOTT M. SEIDEL, TRUSTEE, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | Adv. No. 24-03037-mvl | |
| § | | |
| MSOUTH EQUITY PARTNERS III, L.P., *et al.*, § | | |
| § | | |
| Defendants. § | | |
| § | | |

**TRUSTEE'S RESPONSE OPPOSED TO MOTION TO WITHDRAW REFERENCE**

TO THE HONORABLE DISTRICT COURT AND BANKRUPTCY COURT:

COMES NOW Scott M. Seidel (the "Trustee"), as the chapter 7 trustee of Goodman Networks, Inc. (the "Debtor"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), and of its bankruptcy estate (the "Estate"), and files this his *Response Opposed to Motion to Withdraw Reference* (the "Response"), in response to the *Defendants' Motion to Withdraw the Reference* (the "Motion"), filed by MSouth Equity Partners III, L.P., 1Path Managed Services, LLC, Onepath ITDS Holdings, LLC, Onepath ITDS Buyer, Inc., Onepath

Holdings, LLC, Onepath Holding Corporation, BlueWave Computing, LLC, Onepath Systems of NC, LLC, Direct Resources, LLC, Internet & Telephone, LLC, Paradigm Computer Consulting, Inc., and the unknown shareholders of Paradigm Computer Consulting, Inc (collectively, the "Defendants"), respectfully stating as follows:

## I. SUMMARY

1. Withdrawal of the reference is premature. The Trustee's claims are statutorily and Constitutionally core, and should therefore be heard and determined by the Bankruptcy Court. To the extent the Trustee's claims are not core, the Bankruptcy Court should present its report and recommendation to the District Court. Of course, the situation would be different if the Defendants demanded a jury. However, the Defendants have not made a demand, and so, the Court should not base its decision on hypothetical future events not yet known (and hence why the Motion is premature). In any event, the Bankruptcy Court should continue to hear and determine all non-dispositive matters until this Adversary Proceeding is certified as trial ready.

## II. BACKGROUND

2. This Adversary Proceeding, in a nutshell, concerns the illegitimate and wrongful taking by the Debtor's former Chief Executive Officer, James Frinzi ("Frinzi"), of more than $41.5 million, and then using those funds to purchase the "OIS" division and business line from one or more of the Defendants, with the Defendants receiving the sales proceeds or the benefits thereof. Frinzi transferred the funds in question from the Debtor to American Metals Recovery & Recycling, Inc. ("AMRR"), in exchange for an alleged $44 million promissory note from AMRR to the Debtor (the "$44 Million Transfer"). AMRR then used the funds to purchase the OIS division. While the Trustee has separately sued Frinzi for his actions and other torts, this Adversary Proceeding targets the Defendants under fraudulent transfer theories and claims.

3. Namely, under Count 1 of the Trustee's complaint, the Trustee seeks the avoidance and recovery of the $44 Million Transfer to AMRR as an actually fraudulent transfer under the Bankruptcy Code (sections 548 and 550).

4. Under Count 2 of the Trustee's complaint, the Trustee seeks the avoidance and recovery of the $44 Million Transfer to AMRR as a constructively fraudulent transfer under the Bankruptcy Code (sections 548 and 550).

5. Under Count 3 of the Trustee's complaint, the Trustee seeks the avoidance and recovery of the $44 Million Transfer to AMRR as an actually fraudulent transfer under TUFTA,[1] pursuant to his "strong arm" powers under the Bankruptcy Code (sections 544 and 550).

6. Under Count 4 of the Trustee's complaint, the Trustee seeks the avoidance and recovery of the $44 Million Transfer to AMRR as a constructively fraudulent transfer under TUFTA, pursuant to his "strong arm" powers under the Bankruptcy Code (sections 544 and 550).

7. Under Count 5 of the Trustee's complaint, the Trustee seeks the avoidance and recovery of the $44 Million Transfer to AMRR as a constructively fraudulent transfer under a different provision of TUFTA, pursuant to his "strong arm" powers under the Bankruptcy Code (sections 544 and 550).

8. Under Count 6, the Trustee, now standing in the shoes of the Debtor as a creditor of AMRR, seeks the avoidance and recovery of the $44 million transfer to AMRR as a constructively fraudulent transfer under TUFTA.

9. Under Count 7, the Trustee, now standing in the shoes of the Debtor as a creditor of AMRR, seeks the avoidance and recovery of the $44 million transfer to AMRR as a constructively fraudulent transfer under a different provision of TUFTA.

10. Under Count 8, the Trustee seeks his reasonable attorney's fees under TUFTA.

---

[1] *See* TEX. BUS. & COMM. CODE ANN. §§ 24.001 *et seq*.

11. The Trustee has asserted that the Court's jurisdiction over this Adversary Proceeding is core. Tr.'s Original Compl., ¶¶ 5–6, ECF No. 1. To the extent any matter herein is not core, the Trustee has consented to this Court's entry of final judgment. *Id*. ¶ 7.

12. The Defendants have yet to file an answer.

13. Instead, on July 15, 2024, the Defendants filed a motion to dismiss this Adversary Proceeding. They do not state therein whether this Adversary Proceeding is core or whether they consent to this Court's entry of final judgment. Defs.' Mot. to Dismiss, at 1 n.1, ECF No. 15.

14. In the Motion, however, the Defendants deny that this Adversary Proceeding is core, and they affirmatively state that they do not consent to the Court's entry of final judgment. *See generally* Defs.' Mot. to Withdraw the Reference, ECF No. 16.

### III.   CORE AND NON-CORE ISSUES

15. Counts 1 and 2 are without a doubt statutorily core. *See* 28 U.S.C. § 157(b)(2)(H). So are Counts 3, 4, and 5. *See id*. Technically, so are Counts 6 and 7, because the Trustee seeks the recovery of a fraudulent transfer. *See id*. Count 8 simply seeks attorney's fees as a remedy under TUFTA, and therefore would also be core under section 157(b)(2)(H) (to "recover" a fraudulent transfer). *Id*.

16. However, an issue arises under *Stern*: the fact that the Trustee's claims are statutorily core does not make them Constitutionally core *per se*. In this respect, the Fifth Circuit has held that section 548 and 550 claims (and section 544 claims) are core claims because they were created by Congress and derive entirely from the federal rights conferred by the Bankruptcy Code:

> As a debtor in possession, she seeks to exercise a trustee's 'strong arm' powers under section 544 of Title 11 to avoid any transfer that an unsecured creditor could have avoided under applicable state law. Debtor also seeks relief under section 548 to avoid any fraudulent transfer of an interest of the debtor that was made within one year of the filing of her bankruptcy petition. Accordingly, she also claims

> the remedies available under section 550 to recover such transferred property or interest, or the value thereof, from the transferees or their successors. All of these claims to avoid or recover pre-bankruptcy transfers are "core proceedings" arising under Title 11, pursuant to 28 U.S.C. § 157. These claims are created by the Bankruptcy Code and are not—outside of bankruptcy—available to Debtor.

*Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495–96 (5th Cir. 2002) (citations omitted).

17. *Gandy* was a 2002 case that predated *Stern*, and it may be argued that *Stern* overruled *Gandy*. *Stern* did not. As Judge Jernigan held one year after *Stern*: "this Adversary Proceeding involves claims for alleged preferences and/or fraudulent transfers (see 11 U.S.C. §§ 544, 547, 548, and 550) . . . [n]otwithstanding the holding in *Stern v. Marshall*, this bankruptcy court believes that it has Constitutional authority to issue a final order or judgment in this Adversary Proceeding, as the claims asserted arise under bankruptcy statutes." *Lain v. V3 Constr. Grp., Ltd. (In re Erickson Ret. Communities LLC)*, 475 B.R. 762, 763 (Bankr. N.D. Tex. 2012). Seven years later, Judge Jernigan again stated that avoidance actions under the Bankruptcy Code are Constitutionally core. *Reed v. PLT Constr. Co. (In re BFN Operations, LLC)*, 604 B.R. 268, 270 (Bankr. N.D. Tex. 2019); *accord O'Cheskey v. Herring Nat'l Bank (In re Am. Hous. Found.)*, 520 B.R. 208, 222–23 (Bankr. N.D. Tex. 2014) (Jones, J.).

18. While not all courts agree with the Northern District of Texas, many courts that have considered the question after *Stern* agree that fraudulent transfer claims under the Bankruptcy Code (including section 544 and 550 claims) are Constitutionally core. *See, e.g.*, *Desmond v. Keebler (In re Keebler)*, 658 B.R. 908, 914 (Bankr. N.D. Ill. 2024) ("Avoidance and recovery of a fraudulent transfer are available under alternate theories under 735 ILCS 5/12-112 (made applicable by section 544 of the Bankruptcy Code) or sections 548(a)(1)(A) or (a)(1)(B) of the Bankruptcy Code and are a core matter under 28 U.S.C. § 157(b)(2)(F) in which this court has constitutional authority to enter final orders."); *see also Paragon Litig. Tr. v. Noble Corp. PLC (In re Paragon Offshore PLC)*, 598 B.R. 761, 775 (Bankr. D. Del. 2019) ("Instead, Movants are asking

this Court to extend the holdings of those cases, in order to find that 28 U.S.C. § 157(a) is unconstitutional to the extent that it directs bankruptcy judges to enter final orders in fraudulent transfer claims against parties who have not filed claims against the bankruptcy estate. The Court declines to make that leap."); *see also Tyler v. Banks (In re Tyler)*, 493 B.R. 905, 919 (Bankr. N.D. Ga. 2013) ("For all of these reasons, the Court concludes that the fraudulent transfer action here is within this Court's core jurisdiction and authority to enter a final order").

19. However, some courts disagree. *See Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 565 (9th Cir. 2012); *Stone v. Waldman (In re Stone)*, 698 F.3d 910, 918–19 (6th Cir. 2012); *SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Secs.)*, 490 B.R. 46, 57–58 (Bankr. S.D.N.Y. 2013); *Burns v. Dennis (In re Se. Materials, Inc.)*, 467 B.R. 337, 364 (Bankr. M.D.N.C. 2012). Most of these opinions were issued immediately in the wake of *Stern*, when many courts were reading *Stern* too broadly, as the large consensus of subsequent opinions agrees. *See, e.g.*, *In re Safety Harbor Resort & Spa, LLC*, 456 B.R. 703, 705 (Bankr. M.D. Fla. 2011); *Burtch v. Huston (In re USDigital, Inc.)*, 461 B.R. 276, 292 (Bankr. D. Del. 2011) ("To broadly apply *Stern's* holding is to create a mountain out of a mole hill.").

20. The courts that have read *Stern* broadly focus on *Stern's* discussion of *Granfinanciera*, which *Stern* generally used for the proposition that fraudulent transfer actions are private rights that cannot be assigned to an Article I court for adjudication. *See Stern v. Marshall*, 564 U.S. 462, 492–93 (2011). *Stern* relied on *Granfinanciera's* statement that "[t]here can be little doubt that fraudulent conveyance actions by bankruptcy trustees . . . constitute no part of the proceedings in bankruptcy but concern controversies arising out of it." *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 56 (1989) (citing *Schoenthal v. Irving Tr. Co.*, 287 U.S. 92, 94–95 (1932)).

21. Respectfully, the notion that fraudulent transfer (and other avoidance claims) "constitute no part of the proceedings in bankruptcy" is ignorant and flat wrong. The reason behind

the confusing and confused precedent is that *Stern* relied on *dicta* in *Granfinanciera*, which in turn relied on *dicta* from *Schoenthal*, leading to a double *dicta* situation where the ultimate conclusion is based on a pre-Bankruptcy Code analysis. The importance, quantity, and quality of avoidance actions is enshrined in statute, which immediately proves otherwise. And, to suggest that the very tools by which an estate is reassembled are "no part of the proceedings in bankruptcy" is just wrong.

22. This is not because the Supreme Court is deficient, but because it waded into highly technical terminology and history, which it misunderstood and misapplied. The notion that fraudulent transfer claims are "no part of the proceedings in bankruptcy" comes from 1932 and is a direct quote from *Schoenthal*. 287 U.S. at 94–95. However, the context of the discussion in *Schoenthal* arose back in the days when the difference between suits in equity or at law mattered. And, the Court noted that avoidance actions (in that case, a preference) could have been maintained under the common law in England in courts of law and not in courts of equity (itself a dubious proposition).

23. Even more important, the Supreme Court decided *Schoenthal* before the Chandler Act (also known as the Bankruptcy Act) of 1938, which significantly amended the 1898 Act. Starting with the Chandler Act, fraudulent transfers (and preferences) were no longer a non-bankruptcy, common law right that creditors may have held, but are now a statutory right created and conferred by Congress on the trustee. Section 67 of the Chandler Act labeled "Liens and Fraudulent Transfers," borrowed heavily from the Uniform Fraudulent Conveyance Act and was new—the federal statute for fraudulent transfers, surprisingly similar to today's section 548. Likewise, section 60 was new. Labeled "Preferred Creditors," section 60 was now a federal, Congressionally created preference avoidance statute, very similar to today's section 547, and something that the Supreme Court in *Schoenthal* held did not exist (for the obvious reason that it

had not yet come into existence). With the Chandler Act of 1938, fraudulent conveyance actions were now a part of the comprehensive bankruptcy law itself.

24. The history of the Bankruptcy Code is not easy to understand or explain. When one says that today's Code has its roots in the 1898 Act, that is not quite correct. It is far more correct to say that today's Code really began in 1938, with the Chandler Act. As seen above, that is when Congress created, pursuant to its bankruptcy powers, federal fraudulent transfer, preference, and avoidance action powers (and equivalents of sections 542, 553, and other Code provisions today, all designed to reassemble an estate).

25. Thus, *Stern* relies on *Granfinanciera* for the proposition that fraudulent transfer claims are not Constitutionally core because they are private rights. For this *dictum*, *Stern* draws on *Granfinanciera*, which informs us that "fraudulent conveyance actions . . . constitute no part of the proceedings in bankruptcy," a proposition that any modern practitioner knows to be incorrect colloquially, but something that also incorrect technically when discussing jurisdiction. But it gets more interesting when one sees that the sole support for *Granfinanciera's* statement comes from *Schoenthal*. In other words, it comes from *before* Congress created federal avoidance statutes when yes, it was true, that there were common law actions belonging to creditors. This is what the Trustee means above when he states that *Granfinanciera's* statement is ignorant and flat wrong: ignorant because it is based on outdated and superseded law, and wrong because fraudulent transfer and other avoidance claims are created by Congress pursuant to its bankruptcy powers to reassemble the estate that itself is essential to the subsequent administration and distribution of the estate; *i.e.* a public right. Indeed, the avoidance actions are public rights for another reason as well; avoidance actions hold the wrongdoers accountable to *all* of the debtor's creditors equally and equitably, which is fundamentally different from a private right, which seeks only to determine "the liability of one individual to another under the law as defined." *Stern*, 564 U.S. at 489.

26. *Stern* itself noted that the issue before it was a "narrow one," and that its holding did not meaningfully change the division of labor between the bankruptcy court and the district court. *Id*. at 502. Case after case has acknowledged that *Stern* is therefore to be narrowly interpreted according to the unique facts of that case, where there was a purely non-bankruptcy counterclaim to a filed claim that was denied. *See, e.g., Sundale, Ltd. v. Fla. Assocs. Cap. Enters., LLC (In re Sundale Ltd.)*, No. 12–11450, 2012 WL 5974125, at *3 (11th Cir. Nov. 29, 2012). While the Defendants would analogize that situation to the present one where they have not filed proofs of claim, again the fundamental fact and difference is that the counterclaim in *Stern* existed outside of bankruptcy and was wholly independent of bankruptcy. Here, at least with respect to the Trustee's 544, 548, and 550 claims, that is not the case.

27. If the Court now construes *Stern* to mean that the Court lacks Constitutional authority over avoidance actions—not just fraudulent transfers, that is, since the analysis is the same for preferences—then would that not significantly change the division of labor between the bankruptcy court and the district court exactly as *Stern* said that it was not intending to do? Now, any adversary proceeding where no proof of claim was filed by the defendant would have to be tried in the District Court on Constitutional principles. Why stop there? If the defendant has filed a proof of claim, why would the analysis be any different? Either the Court has Constitutional authority to try an avoidance action or it does not. How filing a proof of claim would change the *Constitution* is hard to conceive. And, if a fraudulent transfer action is a private right, it is difficult to see how it becomes public merely because a claim is filed.

28. In any event, *Stern* made it clear that its holding was a narrow one that was not going to meaningfully change the practice—an important statement in light of the strong arguments made to the Court that its ruling could drastically change and upend the practice, as *Northern Pipeline* had done decades earlier. What then was the pre-*Stern* practice that *Stern*

referred to? It was that bankruptcy courts had core jurisdiction to adjudicate fraudulent transfer claims, even post-*Granfinanciera* (unless of course there was a valid jury right). Such was the rule and holding of the Fifth Circuit. *See Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495–96 (5th Cir. 2002). Such was also the rule in most if not all of circuits. *See, e.g.*, *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers Inc.)*, 4 F.3d 1556, 1558 (10th Cir. 1993). And, as *Stern* itself counsels that its holding is narrow and that it was not intended to meaningfully alter the division of labor, such remains the rule in the Fifth Circuit.

29. A close review of *Stern* demonstrates that Judge Jernigan and those courts who conclude that section 157(b)(2)(H) is Constitutional are correct. Although a lengthy and somewhat confused[2] opinion, *Stern* boils down to the dichotomy between public and private rights, where public rights may be referred to an Article I court and private rights may not. *Stern*, 564 U.S. at 490–91. Summarizing what a public right is, the Court concluded that these are:

> cases in which the claim at issue derives from a federal regulatory scheme . . . . In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action.

*Id.* at 490–91.

30. That is precisely the case here: (i) Congress creates the estate by virtue of section 541; (ii) Congress creates the mechanism by which to reconstitute a fractured estate by virtue of section 542; (iii) Congress protects the estate by virtue of section 362; (iv) Congress created the Trustee; (v) Congress specifies how the estate is to be administered and distributed through many sections of Chapters 3, 5, and 7; and (vi) critically, Congress *augments* the estate that it created and protects by also providing the mechanisms to return to the estate things wrongly taken from it prepetition or post-petition by creating sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy

---

[2] As Justice Scalia pointed out, the Court gave at "least seven different reasons" for its opinion. *See Stern*, 564 U.S. at 504 (Scalia, J., concurring).

Code, which sections have no equivalent outside of bankruptcy (even if there are close analogous rights). The Bankruptcy Code would be a gutted and incomplete statutory scheme to exclude the provisions addressing the return of portions of the *res* wrongly taken from the future estate.

31. It is true that *Stern* referenced *Granfinanciera* for the proposition that *Granfinanciera* held that a fraudulent transfer claim against a non-creditor is not a public right but is instead a private one. *See id*. at 492 (discussing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–55 (1989)). This was *dicta*, even in *Stern*, as the claims involved in that case were not avoidance actions but were purely common law claims. A close reading of *Granfinanciera*, however, demonstrates that the Supreme Court did not rule that a fraudulent transfer claim was a private right.

32. First, the issue before the Court concerned jury rights; not *Stern*-type questions. The analysis with respect to jury rights is obviously not the same. Second, the Court commented (and in *dicta* as the issue concerned the Seventh Amendment) that fraudulent transfer claims may be private rights, but it did not take the next step to affirmatively so state:

> Although the issue admits of some debate, a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) <u>seems to us</u> more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions. . . . There can be little doubt that fraudulent conveyance actions by bankruptcy trustees—suits which . . . 'constitute no part of the proceedings in bankruptcy but concern controversies arising out of it'—are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. They therefore <u>appear</u> matters of private rather than public right.

*Granfinanciera*, 492 U.S. at 55–56 (emphasis added) (internal quotations omitted).

33. "Seems" and "appear" are not holdings and instead demonstrate that the Court was conducting a philosophical discussion by way of analogy. *See, e.g.*, *Gower v. Farmers Home*

*Admin. (In re Davis)*, 899 F.2d 1136, 1140 n.9 (11th Cir. 1990) (noting that *Granfinanciera* suggested, but did not hold, that fraudulent transfer action was a private right). Holdings, affirmations, and reversals do not use such equivocal language. And, respectfully, to state that "there can be little doubt" that fraudulent transfer actions "constitute no part of the proceedings in bankruptcy" is just wrong and more than a little ignorant of the importance and frequency of avoidance actions—without which there may as well be no bankruptcy since a *res* may just as well be picked apart prepetition.

34. In *Katchen v. Landy*, 382 U.S. 323 (1966), the Supreme Court held (using the now obsolete terms "summary" and "plenary" jurisdiction) that the bankruptcy court had summary jurisdiction to adjudicate a preference even if no proof of claim was filed. *Id*. at 399–40. This would be the equivalent to concluding that the bankruptcy court had Constitutional authority to decide the claim; something which, if *Stern* intended to overrule, *Stern* would have made clear. The importance of avoidance claims—which *Stern* suggests constitute no part of the proceedings in bankruptcy—is also aptly demonstrated by *Pepper v. Litton*, 308 U.S. 295 (1939). As held in *Pepper*:

> Courts of bankruptcy . . . are invested 'with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings.' Consequently this Court has held that for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.' . . . . Among the granted powers are the allowance and disallowance of claims; the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the provisions' of the act. In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts.

*Id*. at 303–04 (internal citations omitted). "The collection . . . of the estates of bankrupts" is precisely what avoidance actions are, and its importance has been well recognized by the Supreme Court since at least 1939. *Id*. at 304.

35. The Trustee respectfully submits that neither *Stern* nor *Granfinanciera* sought to overrule these decades of precedent, fundamental to bankruptcy laws. Or, if they intended to do so, they would have made it clear. Rather, as the case law confirms, *Stern* and *Granfinanciera* are narrow cases on narrow facts with narrow holdings, but a whole lot of *dicta* to cloud the issues. And, the issue of private versus public rights is simply different under Article III and the Seventh Amendment.

36. But there is an altogether technical reason why *Stern* does not lead to the conclusion that fraudulent transfer claims are not Constitutionally core when asserted against a non-creditor: remove Justice Scalia's concurrence, and the plurality fails. Justice Scalia filed a concurrence in which he joined in the judgment of the Court but in which he did not adopt the reasoning of the Court, instead offering his own greatly different reasoning, which included a wholesale rejection of the conclusion that a public right need not involve the government as a party. *Stern*, 564 U.S. at 503 (Scalia, J., concurring). As such, Chief Justice Roberts' opinion was not adopted by at least five justices, meaning that it does not carry precedential weight, at least on the reasoning concerning public rights and resort to *Granfinanciera* as support. *See, e.g.*, *Burtch v. Seaport Cap., LLC (In re Direct Response Media Inc.)*, 466 B.R. 626, 643 (Bankr. D. Del. 2012).

37. The Trustee therefore urges the Bankruptcy Court to recommend to the District Court that it conclude that the Trustee's section 548 and 550 claims are statutorily core and Constitutionally core notwithstanding *Stern*, subject to jury rights which the Trustee will address below. To put it simply, the Supreme Court precedent on point is wrong, outdated, confusing and confused, and not even a 5-to-4. All that matters is that the Trustee's claims (except Counts 6 and

7) have no existence outside of bankruptcy and are created by Congress as part of its bankruptcy power and as part of a comprehensive federal scheme, which makes it a public right and one that Congress may assign to the Article I court for adjudication. This is exactly what the Fifth Circuit's still valid precedent in *Gandy* and in *Wood* provides for. *See In re Gandy*, 299 F.3d at 495–96; *see also Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987).

38. Likewise with respect to the Trustee's section 544 claims. *See In re Gandy*, 299 F.3d at 496–97. Even though these claims are based on state law that exists outside of bankruptcy, in no event could the transferor-debtor, or its trustee, bring an UFTA claim because those claims are reserved solely for creditors. It is only by virtue of section 544 of the Bankruptcy Code, and again by virtue of section 550, that the Trustee may bring these claims. Thus, these claims do not exist outside of bankruptcy and are instead created by Congress pursuant to its Constitutional bankruptcy powers: the claims are Constitutionally core. *See, e.g.*, *Faulkner v. Eagle View Cap. Mgmt. (In re The Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr. N.D. Tex. 2011); *Ramirez v. Rodriguez (In re Ramirez)*, 413 B.R. 621, 628 (Bankr. S.D. Tex. 2009) ("[w]hile the TUFTA claim is rooted in state law, it is now a federal claim under 11 U.S.C. § 544 as a result of the commencement of the bankruptcy case (as evidenced by the Trustee's intervention) and 'invokes a substantive right provided by title 11.' Therefore, the TUFTA claim is core." (internal citations omitted)).

39. That being said, there is no question that the Trustee's TUFTA claims brought by the Trustee as a creditor (Counts 6 and 7) are not Constitutionally core because they exist purely outside of bankruptcy.

### IV. JURY RIGHTS

40. The Trustee does not dispute that the Defendants would have jury rights in this Adversary Proceeding, provided of course that they properly assert the same, which they have yet

to do. The Defendants have been careful to hedge on this issue. Whether to assert the jury right is, of course, purely their decision, but the Court should not and cannot assume that the Defendants will assert those rights, and then adjudicate the Motion based on that hypothetical—which is why the Trustee argues that the Motion is premature.

41. Indeed, the Defendants may well determine not to demand a jury. It is also foreseeable that a jury would be more predisposed to agree with the Trustee: you cannot pay for something more than twice what it is worth and not expect to pay it back, especially when you or your agent has conned someone into paying that amount! If the Defendants insist on a jury, then the Trustee would have to agree to a withdrawal of the jury demand, which he is highly unlikely to do. But, all the parties should avoid forum shopping and gamesmanship: not that the Defendants so intend, but it has been known that one would insist on a jury only to stall for time, since jury trials are set late, and that one would seek a trial before the District Court, because that trial is likely to commence much later than in the Bankruptcy Court given the District Court's much broader subject matter docket and conduct of lengthy criminal and civil trials.

42. In sum, the Court should adjudicate the Motion only after the Defendants have made their decision, in order to avoid giving them a smorgasbord to choose from depending on how the Motion is decided.

## V. **WITHDRAWAL OF THE REFERENCE**

43. The Trustee submits that most issues in this Adversary Proceeding are core, which the Bankruptcy Court can and should try to finality, absent jury rights. As for those Counts that are not core:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and

conclusions and after reviewing de novo those matters to which any
party has timely and specifically objected.

28 U.S.C. § 157(c)(1).

44. Where core and non-core issues are present, the Fifth Circuit's *Holland America Ins. Co.* opinion offers meaningful guidance. *See Holland Am. Ins. Co. v. Roy*, 777 F.2d 992, 998–99 (5th Cir. 1985). First, while the District Court can certainly withdraw the reference as it will, the Fifth Circuit has cautioned that its decision to do so "must be based on a sound, articulated foundation" when dealing with core claims, due to Congress' preference that such claims be adjudicated by the specialized bankruptcy court. *Id*. at 998. Second, the factors that should be considered include: "judicial economy," and "promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *Id*. at 999.

45. Here, the factors strongly favor the Bankruptcy Court trying to finality all core claims and, as to any non-core claims that may survive or that may even be relevant after any election of remedies or avoidance of the transfers under federal law:

(i) The Motion is motivated, at least in part, by forum shopping. Unless there is a jury, there is no other reason why the Defendants would seek a trial before the District Court, which itself is unlikely to be an expert on fraudulent transfers, even as it is an expert on many other things.

(ii) Any trial in the Bankruptcy Court would likely be less than one year away. Any trial in the District Court would likely be upwards of two years away. In the meantime, the Defendants are holding on to tens of millions of dollars that properly belong to the Estate. Thus, expediting the bankruptcy process favor retaining the reference.

(iii) Uniformity in bankruptcy administration is a very relevant and present factor here; not only with respect to the Bankruptcy Court and Bankruptcy Code themselves, but also because the Bankruptcy Court at present has before it multiple other Adversary Proceedings involving section 548 and TUFTA claims (which will be detailed at any hearing on the Motion), and avoiding inconsistent results between these lawsuits is important.

(iv) For substantially the same reasons, judicial efficiency is promoted by retaining the reference. The District Court is exceptionally busy on very many important things. Rather than trying a bankruptcy case lasting days, it would be much more efficient for the Defendants or Trustee to object to any discrete proposed finding of fact and then for the District Court to consider those discrete issues. There is no danger of a wholesale second trial.

46. Finally, and irrespective of the Defendants' jury rights and where to try the Trustee's core claims, the reference should be withdrawn only when the Bankruptcy Court first tries all claims and issues any proposed findings of fact and conclusions of law, and/or when the Bankruptcy Court certifies that the Adversary Proceeding is trial ready. This is clearly a power and authority that the Bankruptcy Court has even if it cannot try a claim to finality. *See* 28 U.S.C. § 157(c)(1); *Blackwell v. Zollino (In re Blackwell)*, 267 B.R. 724, 731 (Bankr. W.D. Tex. 2001) ("[t]he district court has the option, at that point of withdrawing the entire matter, or withdrawing only the trial portion, leaving pre-trial and discovery matters to be handled by the bankruptcy judge"). This is the usual and accepted practice in this District, where the bankruptcy court essentially functions as a magistrate, and is the most efficient manner to prepare lawsuits for trial—remembering that Congress has placed a premium on the speed with which bankruptcy claims are adjudicated because of the presence of many creditors awaiting a recovery and the costs and burdens of keeping an estate open.

47. These principles are all the more present here, because of the pendency of other adversary proceedings involving Frinzi and the need to coordinate discovery issues, consider potential consolidations of adversary proceedings for discovery or other purposes, and the possibility of insurance defense (or even coverage litigation). In other words, this Adversary Proceeding and the Defendants do not exist in isolation, and many of the same factual issues (*e.g.*, insolvency), legal issues, discovery, and witnesses are involved in multiple adversary proceedings presided over by the Bankruptcy Court, meaning that that court is best situated to handle all pretrial matters for the benefit of all litigants and additionally the District Court.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court enter an order denying the Motion.

RESPECTFULLY SUBMITTED this 11th day of August, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Ste. 4000
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Email: drukavina@munsch.com
    Email: tberghman@munsch.com
    Email: jvasek@munsch.com

**COUNSEL FOR SCOTT SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 11th day of August, 2024, a true and correct copy of this document was electronically served by the Court's ECF system on counsel for the Defendants.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.