

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 8, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 22-31641-MVL7** |
| **GOODMAN NETWORKS, INC.** | § | **(CHAPTER 7)** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **SCOTT M. SEIDEL, TRUSTEE,** | § | |
| | § | |
| Plaintiff, | § | **ADVERSARY NO. 24-03037-MVL** |
| | § | |
| v. | § | |
| | § | **Related to ECF No. 15** |
| **MSOUTH EQUITY PARTNERS III, L.P., et al.,** | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

## I.    INTRODUCTION

Before the Court is the *Defendants' Motion to Dismiss Trustee's Original Complaint* and *Brief in Support*[1] (collectively, the "**Motion**") filed by Defendants MSouth Equity Partners III, L.P., 1Path Managed Services, LLC, Onepath ITDS Holdings, LLC, Onepath ITDS Buyer, Inc., Onepath Holdings, LLC, Onepath Holding Corporation, BlueWave Computing, LLC, Onepath Systems of NC, LLC, Direct Resources, LLC, Internet & Telephone, LLC, Paradigm Computer Consulting, Inc., and the unknown shareholders of Paradigm Computer Consulting, Inc (collectively the "**Defendants**") on July 15, 2024.[2] Through the Motion, the Defendants seek to dismiss the *Trustee's Original Complaint*[3] (the "**Complaint**") filed on May 24, 2024, by Scott M. Seidel—the duly appointed Chapter 7 trustee for Goodman Networks, Inc. (the "**Debtor**") in the underlying bankruptcy proceeding ("**Seidel**" or the "**Trustee**" or the "**Plaintiff**").

The Trustee's Complaint alleges multiple claims, including fraudulent transfer and avoidance claims pursuant to Sections 544, 548 and 550 of the Bankruptcy Code, and Sections 24.005(a)(2) and 24.006(a) of the Texas Uniform Fraudulent Transfer Act ("**TUFTA**").  The Trustee's Complaint also alleges constructive fraudulent transfer claims pursuant to Sections 24.005(a)(2) and 24.006(a) in the capacity of the Debtor as a creditor. Following the Motion, the Trustee filed an *Objection to the Defendants' Motion to Dismiss Trustee's Original Complaint* and *Brief in Support*[4] on August 16, 2024. Finally, the Defendants filed their *Defendants' Reply to the Trustee's Objection to the Defendants' Motion to Dismiss Trustee's Original Complaint*[5] on August 26, 2024.

---

[1] All ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 24-03037-MVL.
[2] ECF No. 15.
[3] ECF No. 1.
[4] ECF No. 28.
[5] ECF No. 30.

The Court held a hearing on the Motion on August 29, 2024. Counsel for the Trustee and the Defendants appeared. After hearing arguments, the Court took the Motion under advisement. The Court has considered the briefing and arguments of counsel and concludes that the Motion should be **DENIED** in part and **GRANTED** in part. The following constitutes the Court's analysis underlying its ruling.

## II.   JURISDICTION

Bankruptcy subject matter jurisdiction exists in this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). The following ruling shall constitute this Court's reasoning pursuant to Rules 8, 9, and 12 of the Federal Rules of Civil Procedure (the "**Rules**"), as made applicable in adversary proceedings pursuant to Rules 7008, 7009 and 7012 of the Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## III.   STANDARD OF REVIEW

Rule 12(b)(6), incorporated by Bankruptcy Rule 7012(b), authorizes dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."[6] In evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff.[7] However, the Court need not "strain to find inferences favorable to the plaintiffs."[8]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, state a plausible cause of action.[9] "A claim satisfies the plausibility test 'when the plaintiff pleads factual content that allows the court to draw the

---

[6] Fed. R. Civ. P. 12(b)(6).
[7] *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986)).
[8] *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).
[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

reasonable inference that the defendant is liable for the misconduct alleged."[10] This plausibility requirement sits somewhere between possible and probable, and is satisfied where the plaintiff's pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[11]

Although the complaint is not required to provide detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[12] However, numerous courts within the Fifth Circuit have reiterated that because "a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted."[13] In reviewing the motion, the court looks to the pleadings, alongside any documents attached or incorporated into the complaint by reference.

As for claims involving actual fraud, Rule 9(b), as incorporated through Bankruptcy Rule 7009, requires a party to "state with particularity the circumstances constituting fraud or mistake."[14] In other words, Rule 9(b) requires the complaint to set forth "the who, what, when, where, and how" of the events at issue.[15]

## IV.   FACTUAL BACKGROUND

Taking the allegations in the Complaint as true, the following constitutes a brief summary of the allegations necessary to decide the Motion.

### A.   *The Sale of Onepath*

---

[10] *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ, 2021 WL 2546664, at *1 (Bankr. N.D. Tex. June 3, 2022) (Jones, J.).
[11] *Iqbal*, 556 U.S. at 678.
[12] *Twombly*, 550 U.S. at 555.
[13] *Reagor-Dykes*, 2021 WL 2546664 at *2 (citation omitted).
[14] *In re Cogent Energy Servs., LLC*, No. 23-33659, Adv. No. 23-3212, slip op. at *3 (Bankr. S.D. Tex. Aug. 12, 2024).
[15] *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 339 (5th Cir. 2008).

At the core of the Complaint is a "business enterprise" that the Trustee refers to as "**Onepath**," which MSouth Equity Partners III, L.P. ("**MSouth**") acquired in October 2017.[16] Through this purchase, MSouth also acquired several Onepath-related entities, most notably Onepath Systems, LLC ("**Onepath Systems**"). In 2021, Onepath's financial performance dropped "significantly," and to address the increasing concerns from MSouth's various lenders—especially its senior lender, BMO Harris Bank, N.A. ("**BMO**")—MSouth decided to divest and sell Onepath's integrated business solutions division (the "**OIS Division**").[17]

The Trustee alleges in the Complaint that MSouth believed the OIS Division was worth around $25 million and planned to pay off its senior debt following a potential sale of the Division.[18] To facilitate this sale, Onepath and MSouth hired Layer 7 Capital, LLC ("**Layer 7**") as a financial advisor to find potential purchasers and negotiate a final sale of the OIS Division. From there, MSouth and Onepath Systems sought to market the OIS Division, advertising its capabilities in "designing, deploying, and maintaining connectivity solutions," such as structured cabling, audiovisual, electronic security, and fire and life safety solutions.[19]

Layer 7 attempted to sell the OIS Division by reaching out to "over 60 bidders" through teaser emails.[20] The winning bidder, and the eventual purchaser of the OIS Division, was American Metals Recovery & Recycling, Inc. ("**AMRR**"). The purchase, however, ultimately involved another Onepath System subsidiary entity—AMR Resources, LLC ("**AMR**").[21] The winding road of transactions essentially boils down to: (1) MSouth and Onepath Systems organized AMR as a wholly-owned subsidiary of Onepath Systems; (2) Onepath Systems contributed its assets and

---

[16] ECF No. 1, p. 6, ¶ 22.
[17] *Id*. at ¶¶ 25–27.
[18] *Id*. at ¶ 28.
[19] *Id*. at ¶ 37.
[20] ECF No. 15, pp. 1, 4.
[21] *Id*. at pp. 17–18, ¶ 102(a)–(e).

liabilities to AMR, including the OIS Division; and (3) AMRR purchased the equity in AMR from Onepath Systems for a purchase price of $40,407,647.70.[22] Although this purchase agreement included several other terms between and among Onepath Systems, AMR, and AMRR, the exchange resulted in AMRR as the buyer—by acquisition of AMR—and Onepath Systems as the seller/recipient of ultimately $41,209,647.70 in transferred funds.

The Trustee further alleges that after the sale, "a dispute arose between AMRR, Onepath Systems, and MSouth" concerning the transfer of material assets from Onepath Systems to AMR as part of the purchase agreement terms.[23] To remedy this, MSouth agreed to transfer ownership of Onepath Systems to AMRR through the following steps: (1) the Defendants organized 1Path Managed Services, LLC ("**1Path**") as a Onepath Systems subsidiary; (2) Onepath Systems contributed its assets and liabilities to 1Path; (3) Onepath Systems contributed its membership interests in 1Path to Onepath Holding Corporation ("**Onepath Holding**"); and (4) Onepath Holding transferred and assigned its membership interests in Onepath Systems to AMRR.[24] The Trustee alleges that this series of transactions resulted in 1Path being the successor-in-interest to the liabilities Onepath Systems would have otherwise been liable for in connection with the OIS purchase.[25]

### B. The Purchase of Onepath

As to the buyer-side of the purchase of the OIS Division, it is equally important to distill how AMRR served as the purchasing entity, including the involvement of James Frinzi ("**Frinzi**")—the Debtor's CEO—as well as the Debtor's subsidiary—GNET ATC, LLC ("**GNET**").

---

[22] *Id.*
[23] *Id.* at pp. 19–20, ¶¶ 110–11.
[24] *Id.* at p. 22, ¶ 120.
[25] *Id.* at ¶ 121.

Prior to the sale of the OIS Division, the Debtor and its subsidiaries were a value-added reseller ("**VAR**") for Fedex Supply Chain Logistics & Electronics, Inc. ("**FedEx**").[26] According to the Complaint, the Debtor's contract with FedEx comprised nearly 20% of its revenue in 2021, and resulted in a large amount of money moving in and out of the Debtor's bank accounts regularly, pursuant to required consistent payments to FedEx in return.[27] Ultimately, the Debtor stopped making payments. This action led to the Debtor accumulating nearly $80 million in unpaid funds to FedEx.[28]

In 2021, Jay Bock, the CEO of a Debtor-affiliated entity—Genesis Networks Telecom Services, LLC ("**Genesis**")—received one of the Layer 7 teaser emails regarding the OIS sale. Bock forwarded this information to the Debtor's sole director, James Goodman, who forwarded it to Frinzi.[29] On September 22, 2021, Bock and Onepath Systems entered into a confidentiality agreement that allowed Bock to inspect the OIS data room to help further negotiations. Layer 7 was then contacted on that same day by Frinzi showing interest in purchasing the OIS Division.[30]

Although Layer 7 sent Bock and Frinzi a "first round process letter," the Trustee alleges in the Complaint that the Defendants never heard from anyone on the Debtor's side other than Frinzi until after the finalized purchase with AMRR.[31] Frinzi, on October 22, 2021, submitted an indication of interest ("**IOI**") in the OIS Division, sent from his GNET email address but signed in his capacity as CEO of an unaffiliated entity—Multiband Global Resources, LLC ("**MGR**"). MGR was a recently organized entity and had no apparent common ownership with Goodman, GNET, or Genesis.

---

[26] ECF No. 1, p. 8, ¶ 41.
[27] *Id.*
[28] *Id.* at p. 8, ¶ 42.
[29] *Id.* at p. 9, ¶¶ 43–48.
[30] *Id.* at p. 9, ¶ 47.
[31] *Id.* at p. 9, ¶ 51.

Frinzi's IOI proposal, per the Complaint, was to acquire the OIS Division for $18.2 million in cash and $7.8 million of MGR Stock.[32] Onepath Systems also received a separate IOI from a third-party bidder for a potential $30 million to $35 million to acquire the OIS Division.[33] However, the Trustee alleges that the bid was "merely aspirational" as a means of the third-party getting Layer 7 and MSouth's attention, and was also "expressly conditioned upon due diligence" by the parties before becoming a legitimate offer.[34] The Trustee further alleges that, despite the fact that the competing bid was ultimately a $20 million offer for the OIS Division, Layer 7 emailed Frinzi on November 30, 2021—on Onepath Systems' behalf—stating that the highest offer they had received was in the "mid-$30s."[35] Following the November 30th email, Frinzi, in his capacity as MGR's CEO, submitted a second IOI on December 13, 2021, to purchase the OIS Division for $38 million—a $20 million dollar increase from his original IOI, according to the Trustee.[36]

Between Frinzi's second IOI and the purchase date, the Trustee alleges that not only did Layer 7 and Onepath Systems have "concerns" about Frinzi and MGR's ability to complete the purchase, but that the Defendants "knew or should have reasonably known" that the funds Frinzi was attempting to use to facilitate the purchase belonged to the Debtor.[37] Per the Complaint, Frinzi not only primarily responded to the Defendants via his GNET email account, but also screenshotted pictures of GNET bank accounts to highlight the funds available to MGR, even though GNET and MGR were allegedly unaffiliated entities.[38] Despite these alleged warning signs, Layer 7 and Onepath Systems placed their "heads into the sand" and moved forward with Frinzi's proposal without a "legitimate reason" to believe the funds being used for the purchase of the OIS

---

[32] ECF No. 1, p. 10, ¶ 56.
[33] *Id.* at p. 10, ¶ 57.
[34] *Id.* at p. 10, ¶ 58.
[35] *Id.* at p. 11, ¶¶ 59–60.
[36] *Id.* at pp. 11, 12, ¶¶ 64, 69.
[37] *Id.* at pp. 12–13, ¶¶ 66–76.
[38] ECF No. 1, pp. 12–13, ¶¶ 66–76.

Division were actually coming from MGR.[39] The purchase was ultimately finalized on February 1, 2022, with Frinzi at the wheel steering things from the buyer-side.[40]

Interestingly, the sale did not occur with MGR as the buyer. Instead, in December 2021, MGR purchased the majority of outstanding shares in AMRR, and in January 2022, Frinzi caused $44 million in transfers from the Debtor's bank account to the newly acquired AMRR bank account.[41] The transfer between the Debtor and AMRR was secured by a promissory note, which the Trustee alleges was made payable to GNET instead of the Debtor by mistake.[42]

In summary, the Trustee alleges that the Debtor, at Frinzi's direction, transferred $44 million to AMRR to fund the purchase. AMRR then purchased the OIS Division.  Eventually, Onepath Systems then transferred its liabilities related to the transaction with AMRR to 1Path.

### C. The Causes of Action

At the core of the parties' dispute is whether the sale can be avoided by the Trustee as a fraudulent transfer under either the Bankruptcy Code or TUFTA. Accordingly, there are three main focal points for the Court: (1) whether Frinzi engaged in intentional or constructively fraudulent actions, on behalf of the Debtor, through the *initial* transfer of $44 million from the Debtor to AMRR; (2) each of the Defendants' respective transferee status in receiving funds through the *subsequent* transfer during the purchase; and (3) the existence of any affirmative defenses that any of the Defendants may have.

The Defendants' primary arguments are three-fold: (1) the Trustee cannot plausibly allege intentional or constructive fraud by the Debtor; (2) it cannot plausibly allege that any of the Defendants other than 1Path Managed Services are transferees at all; and (3) even if the Defendants

---

[39] *Id*. at p. 14, ¶¶ 78–81.
[40] *Id*. at p. 17, ¶ 102.
[41] *Id*. at p. 15 ¶¶ 85–86.
[42] *Id*. at pp. 16–17, ¶ 98.

are subsequent transferees, the facts alleged in the Complaint are sufficient to establish affirmative defenses on behalf of the Defendants, which should result in the dismissal of the Complaint.

As to transferee status, the Defendants argue the Trustee's claims should be dismissed because they are not initial or subsequent transferees. More specifically, the Defendants contend that the Trustee does not sufficiently allege the Defendants "received or had any control over the funds paid by AMRR to purchase the OIS Division."[43] The Defendants argue that "dominion and control" for purposes of transferee status is absent where an entity is merely a "conduit" to the transfer, and that none of the entities actually received any of the transferred funds before the funds were then "simultaneously" transferred to BMO at closing.[44] The Defendants further contend that the Trustee also fails to allege that the Defendants are subsequent transferees simply by serving as equity holders in Onepath Systems.[45]

As to the Debtor's alleged actions during the initial transfer, the Defendants argue the Trustee fails to sufficiently allege actual fraud under §§ 544(a) and 548(a) of the Bankruptcy Code and §24.005(a)(1) under TUFTA. Additionally, the Defendants argue the Trustee fails to allege that the Debtor committed constructive fraud under either §§ 544(b) or 548(b) of the Code and §§ 24.005(a)(2) and 24.006(a) of TUFTA.

As to the actual fraudulent transfer claims, the Defendants argue that the "badges of fraud" necessary to prove actual intent by the Debtor to hinder, delay, or defraud the Debtor's creditors are not "plausible on their face," and that at most the Trustee alleges an "insider transaction" between Goodman and AMRR.[46]As to the constructive fraudulent transfer claims, the Defendants argue that the transaction between the Debtor and AMRR was for "reasonably equivalent value"

---

[43] ECF No. 15, pp. 11–12.
[44] *Id*. at p.12.
[45] *Id*. at pp. 12–13.
[46] *Id*. at p. 16.

based on the facts that (1) the Debtor received a promissory note in exchange for the $44 million transfer to AMRR; and (2) at the very least, using a market price valuation, the OIS Division was worth $23 million.[47] In other words, the Defendants assert that the Trustee cannot plausibly allege a lack of reasonably equivalent value because the sale process shows that the Debtor received an asset worth at least $23 million after a "robust, arms-length negotiation."[48]

As to any applicable affirmative defenses, the Defendants pose two arguments. The first is that the Complaint, on its face, establishes that the subsequent transfer to 1Path was (1) for value, (2) in good faith, and (3) without 1Path's knowledge of the transfer's voidability.[49] Second, the Defendants argue the Trustee's two TUFTA claims should be dismissed because the Complaint, on its face, establishes the elements of the unclean hands doctrine and therefore precludes the Debtor from filing suit from a position as AMRR's creditor to the initial transfer. Put differently, the Trustee "cannot use TUFTA to unwind the transaction that the *Debtor* orchestrated, and which forms the basis of the Debtor's alleged 'creditor' status."[50] Finally, the Defendants seek dismissal of the Trustee's claim for attorney's fees, given that such fees are a form of relief and not a cause of action, requiring dismissal.

## V.   LEGAL ANALYSIS

### A.   *The Defendants' Alleged Transferee Status*

To address the Defendants' Motion, the Court must first address which, if any, of the Defendants constitute "transferees" in this matter. The Trustee argues that it has plausibly pleaded that all the Defendants were subsequent transferees. More specifically, it argues that:

---

[47] *Id*. at p. 18.
[48] *Id*.
[49] ECF No. 15, pp. 21–23.
[50] *Id*. at pp. 23–24 (emphasis added).

(a) the Defendants were all part of the an integrated business enterprise known collectively as 'Onepath'; (b) the Defendants collectively owed debts to BMO; (c) the Defendants also shared members and officers; (d) MSouth caused $35,943,261.00 of the purchase price to be paid to BMO, in satisfaction of a debt owed by some or all of the defendants; (e) the $44 Million Transfer 'paved the way for a beneficial recapitalization later in 2022'; and (f) $5,266,386.70 [of the $44 Million Transfer] is unaccounted for and plausibly could have been distributed to equity, whichever Defendant or Defendants that might be.[51]

In essence, the Trustee argues that the Complaint plausibly establishes that the Defendants "form a single business enterprise with common liabilities and the same individuals in control," and that the Court can "reasonably infer" these facts.[52] In support, the Trustee emphasizes that the Code does not define what a "transferee" is, and that a number of circuits utilize the "dominion and control" test to identify those with "the right to put the money to one's own use."[53] The Trustee asserts that BMO pressured "all of the Defendants" into selling the OIS Division, and that all of the Defendants maintained some role in that transferred funds being paid to BMO to satisfy the collective debt.[54] Additionally, Rule 8 does not require any more than the level of identification that the Trustee has provided.

Courts have consistently held that § 550(a) "permits a trustee to recover property transferred, or value of the property transferred, from the initial transferee of an avoided transfer or any immediate or mediate transferee ('subsequent transferee') of the initial transferee."[55] However, "transferee" is not defined in the Bankruptcy Code, and therefore it is up to the Courts to determine a party's "transferee" status.[56]

---

[51] ECF No. 28, p. 9, ¶ 20.
[52] *Id*. at p. 10, ¶ 21.
[53] *Id*. at p. 10, ¶ 22. (quoting *Sec. First Nat'l Bank v. Brunson* (*In re Coutee*), 984 F.2d 138, 141 (5th Cir. 1993)).
[54] ECF No. 28, p. 12, ¶ 23.
[55] *Southmark Corp. v. Schulte, Roth & Zabel, L.L.P*., 242 B.R. 330, 337 (N.D. Tex. 1999).
[56] *Id*. at 338.

To add to the complexity, the widely-cited Seventh Circuit decision in *Bonded Financial Services, Inc. v. European American Bank* established that the particular structure of § 550(a)(1) also "separates initial transferees and beneficiaries."[57] Therefore, an "entity for whose benefit" a fraudulent transfer is made "is different from a transferee, 'immediate' or otherwise."[58] In sum, courts have classified parties as one of three potential actors in an alleged fraudulent transfer: (1) the initial transferee; (2) an "entity for whose benefit" the initial transfer was made; or (3) a subsequent transferee. The first two cannot affirmatively raise a "value-and-good-faith defense," as the *Bonded Financial* court phrased it, while a subsequent transferee can.[59]

The Trustee correctly notes that the Fifth Circuit has adopted the "dominion or control" test, in which "a party is not considered an initial transferee of a transfer received directly from the debtor unless that party gains actual dominion or control over the [transferred] funds."[60] Conversely, a party who "receives but does not gain actual dominion or control over the funds . . . is considered a mere conduit or agent for one of the parties to the transaction."[61] As this Court has held, the difference between an initial transferee and a "mere conduit," is that dominion or control means the transferee has "the right to put the money to one's own use for whatever purpose the [transferee] so desires."[62] Applying the test requires the court to step back and evaluate a transaction in its entirety to make sure that its conclusion is logical and equitable.[63]

Although less explicit, courts have generally evaluated a party's subsequent transferee status under the same terms. In *Bonded Financial*, the Seventh Circuit used its same initial transferee method to then alternatively evaluate whether the same entity was a subsequent

---

[57] 838 F.2d 890, 895 (7th Cir. 1988).
[58] *Id.*
[59] *Id.*
[60] *Southmark*, 242 B.R. at 338
[61] *Id.*
[62] *Id.*
[63] *Id.* (citation omitted).

13

transferee instead.[64] In *Southmark*, the court held that undisputed evidence showing one of the parties kept the money transferred to it, and supporting evidence showing it then used the funds for its own benefit, were sufficient to hold that the party was a subsequent transferee.[65]

As for an "entity for whose benefit such transfer was made," the *Bonded Financial* court emphasized that the paradigm example for this classification is a guarantor, or "someone who receives the benefit but not the money."[66] The court in *Heritage Organization* noted that even when the debtor's income "passed through various entities and ended up on [a third party's] personal income tax return," this evidence alone is insufficient to classify a party as the "entity for whose benefit such transfer was made."[67] Rather, the facts would likely need to be much closer to what the *Bonded Financial* court hypothesized: "If Bonded had sent a check to the Bank with instructions to reduce [a third party's] loan, the Bank would have been the initial transferee and [the third party] the 'entity for whose benefit.'"[68]

There is no question in the Court's mind that none of the Defendants in this matter qualify as initial transferees subject to § 550(a)(1). The Trustee's Complaint makes clear that the "transfer" in question is the Debtor's $44 million transfer to AMRR.[69] The Complaint also explicitly states that AMRR is the initial transferee, and that it is AMRR's $38 million transfer to Onepath Systems that makes all the Defendants subsequent transferees.[70]

It is equally clear to the Court that all of the Defendants are not entities for whose benefit the Debtor's transfer to AMRR was made, despite the Trustee's arguments to the contrary. There is no guarantor relationship between the Defendants and the Debtor, nor is there any plausible

---

[64] *Bonded Fin.*, 838 F.2d at 896.
[65] *Southmark*, 242 B.R. at 340.
[66] *Bonded Fin.*, 838 F.2d at 895.
[67] *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 496 (Bankr. N.D. Tex. 2009) (Houser, J.).
[68] *Bonded Fin.*, 838 F.2d at 895.
[69] ECF No. 1, p. 23, ¶¶ 124–28.
[70] *Id.* at pp. 23–24, ¶¶ 128–30.

allegation that Frinzi, on behalf of the Debtor, instructed AMRR to use the $44 million to help the Defendants pay off their collective debt to their secured lenders. *Bonded Financial* makes clear that "only a person who receives a benefit from the *initial* transfer" is within the definition of a party for whose benefit a transfer is made.[71] At most, the Defendants benefitted from the *subsequent* transfer.

The notion that *all* the Defendants constitute subsequent transferees is where the Court must disagree with the breadth of the Trustee's claims as to certain Defendants. In the Rule 8(a) context, the District Court for the Northern District of Texas established that "where more than one defendant allegedly committed the same act together, a complaint is not defective for the reason that it asserts that all defendants committed that same act, without identifying each individual defendant."[72]

"Group pleading is acceptable if the plaintiff 'intend[s] to allege that each defendant committed the alleged acts,' and the acts could have been committed by *more than one* defendant."[73] An example of that distinction can be found in *Neighbors Legacy Holdings,* where the court found the trustee's allegations against individual transferors did not pass Rule 8 muster because the transferors' insolvency was alleged only on a "group basis."[74] In light of the trustee's failure to "identify which specific transferors were insolvent at the time of the allegedly fraudulent transfers," and the complaint's blanketed insolvency allegation across all the transferors as a whole, the trustee's claim fell below Rule 8(a) pleading standards. [75]

---

[71] *Bonded Fin*., 838 F.2d at 896 (emphasis added).
[72] *Wilson v. Deutsche Bank Tr. Co. Americas*, Civ. Action No. 3:18-CV-0854-D, 2019 WL 175078, at *7 (N.D. Tex. Jan. 10, 2019).
[73] *In re Neighbors Legacy Holdings, Inc*., 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022) (quoting *Clapper v. Am. Realty Ins., Inc.*, Civ. Action No. 3:14-CV-2970-D, 2015 WL 3504856, at *4 (N.D. Tex. June 3, 2015) (emphasis added).
[74] *Neighbors Legacy Holdings*, 645 B.R. at 895.
[75] *Id*.

Such standards are not just limited to the bankruptcy context. This type of "shotgun" pleading—attributing "discrete actions . . . to all or multiple defendants without explaining the basis for such grouping or distinguishing between the relevant conduct of the named Defendants"—is often insufficient under Rule 8(a) within the Fifth Circuit.[76]

The Court finds the Complaint here to be plagued with similar issues regarding certain named Defendants. These issues ultimately derive from the Trustee's premise, as articulated in the Objection: that the Court can reasonably infer "one or more of the Defendants were also subsequent transferees" because they "were all part of an integrated business enterprise known collectively as 'Onepath.'"[77] To connect the Trustee's dots, the Defendants have been grouped because: (1) they collectively owed debts to BMO; (2) shared officers and members across the different entities; (3) MSouth directed the funds from the purchase of the OIS Division to satisfy the debt all of the Defendants owed to BMO; and (4) roughly $5.2 million of the $44 million transferred from AMRR to the Defendants is unaccounted for and could have plausibly been distributed to any of the Defendants.[78]

The frailty of this premise is not that the Trustee has not pleaded sufficient facts as to *some* of the named Defendants; the issue is that he has not done so for *all* of them. Much like the group designation of insolvency in *Neighbors Legacy Holdings*, the Trustee designates all the Defendants as subsequent transferees without sufficient justification for doing so.

The Court is satisfied with the Trustee's allegations regarding 1Path because the Complaint plausibly alleges that its successor-in-interest status to Onepath Systems establishes its role as a subsequent transferee. Similarly, the Court finds no issues with the Trustee's "integrated business

---

[76] *United States v. Lakeway Reg'l Med. Ctr., LLC*, No. A-19-CV-00945-JRN, 2020 WL 6146571, at *2 (W.D. Tex. Feb. 13, 2020).
[77] ECF No. 28, p. 10, ¶ 21; *see also* ECF No. 1, p. 6, ¶ 22.
[78] *Id.* at p. 9, ¶ 20.

enterprise" premise to the extent it involves MSouth and each of the Defendants with a Onepath-affiliated name (the "**Onepath Defendants**")[79]. The Complaint sufficiently alleges that each of the Onepath Defendants were either part of Onepath, owned most of the equity in Onepath, or were the successor-in-interest to Onepath.

The Trustee further alleges that it was MSouth who not only owned and managed the various Onepath Defendants, but it was MSouth who attempted to "market and sell the OIS Division" and sought out Layer 7 to assist in the negotiations.[80] Coupled with the fact that MSouth—the alleged parent entity of the Onepath Defendants—and Onepath Systems—the alleged bottom-rung subsidiary—were both involved with the AMRR negotiations, it is reasonable for the Court to infer that the Onepath Defendants in between those two can be plausibly classified as more than "mere conduits" to the sale of the OIS Division.

The Court agrees with the Defendants that the Trustee's use of the "collapsing doctrine" is expansive, and that subsequent transferee status cannot be based *solely* on the Defendants' "membership" within the Onepath structure. However, courts have consistently held that "transferee" status can be based on one's ability to put the transferred funds to one's own use.[81] The Complaint alleges that, upon the transfer from AMRR to 1Path, those funds were used in accordance with what MSouth and Onepath wanted—to pay off their collective debt to their secured lenders. The negotiations between MSouth, Onepath Systems, and Frinzi regarding the sale were allegedly facilitated with that use in mind. The existence of those facts in the Complaint are enough to satisfy Rules 8 and 12 with specific regard to MSouth, the Onepath Defendants, and 1Path. However, a line must be drawn somewhere.

---

[79] To clarify, the Court's reference to the Onepath Defendants applies specifically to the Defendants listed in the Complaint that have the word "Onepath" in their title.
[80] ECF No. 1, p. 7, ¶ 34.
[81] *See e.g., Southmark*, 242 B.R. at 338.

There is not a single plausible thread that the Trustee even attempts to tie between the $44 million transfer between AMRR and the following Defendants: Bluewave Computing, LLC; Direct Resources, LLC; Internet & Telephone, LLC; the Unknown Shareholders of Paradigm Computer Consulting, LLC; and Paradigm Computing Consulting, Inc. Instead, the Trustee fashions a "shotgun pleading" attributing the MSouth and Onepath Defendants' actions to the remaining Defendants. To provide an example of this, the Court points specifically to Defendant Bluewave Computing, LLC ("**Bluewave**"). Out of the four times Bluewave is referred to, none of these four instances occurs outside of the title page or the "Parties" section of the Complaint. The Trustee does not attribute or allege a single act towards Bluewave.[82]

While the Court understands the Trustee's "single business enterprise" premise, the significant time and energy it spends detailing MSouth, 1Path, and the Onepath Defendants' collective actions only draws more attention to the lack of any tangible tie to the others. It is one thing for a court to connect the dots where a plaintiff lays the groundwork for plausible inferences throughout its complaint. It is an entirely different thing for a plaintiff to fail to draw the dots altogether and ask the court to do it for them.

Therefore, the Court dismisses, without prejudice, the following Defendants, as the Trustee has not plausibly alleged they are subsequent transferees subject to the relevant causes of action: Bluewave Computing, LLC; Direct Resources, LLC; Internet & Telephone, LLC; the Unknown Shareholders of Paradigm Computer Consulting, LLC; and Paradigm Computing Consulting, Inc.

### B. *Actual Fraudulent Transfers*

---

[82] ECF No. 1, p. 4., ¶ 16.

The Court now transitions to the Trustee's various actual and constructive fraudulent transfer claims, beginning with actual fraud. Regarding actual fraudulent transfer, the Trustee contends that it sufficiently pleaded six badges of fraud, and that even under an arguably heightened Rule 9(b) pleading standard, the Complaint should survive the Defendants' Motion.

As the Trustee's states succinctly in his Objection, to plead a subsequent transfer claim, the Trustee "must plead [1] that the *initial* transfer is avoidable and [2] the defendant is a subsequent transferee of that initial transferee."[83] Given that the Court has already addressed the second element, it follows that it must also determine whether the Trustee has sufficiently alleged that the initial transfer between the Debtor and AMRR constitutes a fraudulent transfer under § 544, through TUFTA, and § 548.

For actual fraudulent transfer, it is clear that both the Bankruptcy Code and TUFTA require a plaintiff to allege that the debtor "made a transfer 'with actual intent to hinder, delay, or defraud,' any creditor of the debtor."[84] Both the Fifth Circuit and Texas law recognize certain "badges of fraud" representing commonly considered circumstantial evidence bearing on actual fraud.[85] Two issues therefore remain: (1) whether the Trustee sufficiently alleged the existence of these badges of fraud under either § 548 or TUFTA to survive the Defendants' Motion; and (2) the pleading requirements to which the Complaint must adhere.

The Trustee correctly notes that the Fifth Circuit has not decided whether Rule 9(b) applies to an actual fraudulent transfer under the Bankruptcy Code and TUFTA,[86] but recognizes that at

---

[83] ECF No. 28, p. 9, ¶ 19 (quoting *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018)).

[84] *U.S. Bank Nat. Ass'n v. Verizon Comms., Inc.*, 817 F. Supp.2d 934, 940 (Bankr. N.D. Tex. 2011) (quoting Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)).

[85] *In re 1701 Com., LLC*, 511 B.R. 812, 835–36 (Bankr. N.D. Tex. 2014) (Lynn, J.); *see also In re Cipolla*, 476 F. App'x 301, 307 (5th Cir. 2012) (noting that courts have looked to state law "badges of fraud" when evaluating intent to defraud in the §522(o) context).

[86] ECF No. 28, p. 12, ¶ 26.

least one district court in the Northern District of Texas has recently concluded that the complaint must satisfy the Rule 9(b) pleading standard where it "requires actual intent to defraud as an element of the claim."[87] However, courts within the Northern District of Texas have not unanimously adopted this approach.[88] Conversely, the Court notes at least two other circuits as well as bankruptcy courts in both the Southern and Western Districts of Texas have applied Rule 9(b) pleading standards to actual fraudulent transfer claims.[89] Given the undecided nature of the issue, the Court will address whether the Complaint meets Rule 9(b)'s heightened pleading standards for actual fraudulent transfer.

Accordingly, the Court must address what is required of a plaintiff in order to satisfy its Rule 9 burden. In *Think3,* the bankruptcy court reiterated that "a party alleging fraud should specify the 'who, what, when, where, and how' of the alleged fraud," but that what constituted sufficient particularity "will necessarily differ with the facts of each case."[90] There, the court highlighted the fact that the plaintiff "specifically pointed to dates, amounts and individuals who were involved in the alleged fraudulent transfers with intent to defraud creditors."[91] Conversely, in *Dual D Health Care Operations*, the Honorable E. Lee Morris found the trustee's "scattershot allegations" to be insufficient for Rule 9(b) purposes because, while the complaint "touch[ed] upon various badges of fraud," it "fail[ed] to tie them together in a sufficiently succinct manner . . . with respect to each particular targeted transfer."[92]

---

[87] *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 652–53 (N.D. Tex. 2020).
[88] *See Janvey v. Alguire*, 846 F. Supp.2d 662, 676–77 (N.D. Tex. 2011) (holding that it could find no "principled reason" to apply Rule 9's pleading requirements to a receiver's fraudulent transfer claims under TUFTA) (citation omitted) (internal quotations omitted).
[89] *See Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 225, 226, n. 6 (8th Cir. 2018); *see also Gen Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1078–79 (7th Cir. 1997); *see also NorthStar*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020); *see also In re Think3, Inc*., 529 B.R. 147, 197 (Bankr. W.D. Tex. 2015).
[90] *Think3*, 529 B.R. at 197.
[91] *Id*.
[92] *In re Dual D Health Care Ops., Inc*., No. 17-41320-ELM, Adv. No. 20-04059, 2021 WL 3083344, at *14 (Bankr. N.D. Tex. July 21, 2021) (Morris, J.).

Here, the Trustee's actual fraudulent transfer claims reflect the type of detailed allegations found in *Think3*. The Complaint includes the particularity the Fifth Circuit found to be sufficient with respect to "the transferor, transferee, amounts, and time period," along with "pages of allegations detailing the underlying fraudulent scheme."[93] The Complaint explains the particular relationship between the various entities on both the Debtor's and the Defendants' sides, provides a detailed timeline of when, where, and how the initial and subsequent transfers took place, and includes specific actions and communications by both the Debtor and the Defendants leading up to the initial transfer from the Debtor to AMRR.

The Court acknowledges the Defendants' argument that the Complaint "pleads no facts from which it can be reasonably inferred that any of the Movants, other than [1Path], received the subject funds or had any 'dominion or control' over such funds."[94] The focus for alleging an actual fraudulent transfer, however, is not solely on the Defendants' involvement as subsequent transferees, but on whether there are sufficient allegations of actual fraud regarding the initial transfer between the Debtor and AMRR. The key is whether the Trustee alleges, with particularity, how the badges of fraud under either § 548 or TUFTA align with *Frinzi's* actions on behalf of the Debtor. Here, the Trustee provides a detailed timeline of such actions, and identifies the specific badges of fraud that relate to these actions. That is more than enough for purposes of a Rule 12(b)(6) Motion, even under a heightened Rule 9 pleading standard. The Defendants' Motion is therefore **DENIED** regarding the actual fraudulent transfer claims under § 548 and TUFTA.

### C. *Constructive Fraudulent Transfers*

---

[93] *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 119 (5th Cir. 2019).
[94] ECF No. 15, p. 2.

The Defendants contend that the Trustee has failed to properly plead constructive fraudulent transfer claims under § 548 and TUFTA as well. The Trustee contends that it adequately pleaded a constructive fraudulent transfer because the promissory note given in exchange for the $44 million is incongruent with the Fifth Circuit's definition of "reasonably equivalent value," which generally means "the debtor has received value that is substantially comparable to the worth of the transferred property."[95] In other words, the Trustee posits that the promissory note given to the Debtor was essentially an "IOU" from Frinzi himself, with no real comparable value.[96]

The Fifth Circuit has made clear that in order to plead a sufficient claim for constructive fraudulent transfer, a plaintiff "must plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) the transferor was 'financially vulnerable' or insolvent at the time of the transaction."[97] Here, the Court follows the Southern District's recent decision in *Alta Mesa Resources*, which held that Rule 8 pleading standards apply in the constructive fraudulent transfer context instead of Rule 9 because, rather than basing fraud on intent, "the transaction is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee."[98]

As the Honorable Robert Jones held in *Reagor-Dykes Motors*, a complaint that only states that the debtor received less than reasonably equivalent value fails the plausibility requirements.[99] Where a complaint alleges a specific transfer, "but without any information related to any invoices," and with only one sentence that stated the debtors received less than reasonably

---

[95] ECF No. 28, p. 16, ¶ 30 (citing *Stanley v. U.S. Bank Nat'l Ass'n* (*In re TransTexas Gas Corp.*), 597 F.3d 298, 306 (5th Cir. 2010).
[96] ECF No. 28, p. 17, ¶ 32.
[97] *Life Partners*, 926 F.3d at 120.
[98] *In re Alta Mesa Res., Inc.*, No. 19-35133, Adv. No. 21-3909, 2024 WL 4379801, at *3 (Bankr. S.D. Tex. Oct. 1, 2024) (citing *Life Partners*, 926 F.3d at 118).
[99] *Reagor-Dykes*, 2021 WL 2546664 at *4.

equivalent value, the complaint cannot survive a motion to dismiss.[100] Similarly, in *Crescent Resources,* the bankruptcy court found the complaint to be insufficient under Rule 8(a) even when it included invoice dates and amounts, payment dates and amounts, and the wire transfer numbers because the complaint "no more than mirror the elements of § 548(a)(1)(B)."[101]

To survive a motion to dismiss, the complaint must therefore plausibly allege that the debtor did not receive "value that is substantially comparable to the worth of the transferred property."[102] Measuring what constitutes reasonably equivalent value is done through focusing on "the net effect of the transfers on the debtor's estate, and the funds available to the unsecured creditors."[103]

Here, the Court once again finds that the Trustee's Complaint sufficiently alleges constructive fraudulent transfer under both § 548 and TUFTA. The support can be found in the numerous allegations in the Complaint regarding the Debtor's financial condition and the relationships among all the Frinzi-controlled entities. First, the Complaint details the invoices and payments involved in the $44 million transfer between the Debtor and AMRR.[104] The Trustee alleges six different transfers in 2022 coming from the Debtor's account to AMRR's account, totaling the $44 million. Second, the Trustee ties these transfers to allegations that the note transferred back to the Debtor in exchange for $44 million was effectively worthless because AMRR, and its parent company MGR, were controlled by Frinzi. Finally, the Trustee highlights that prior to all these transfers, the Debtor was not paying its debts to as they became due, allegedly

---

[100] *Id.*

[101] *Bensimon v. Nexen Pruet, LLC* (*In re Crescent Res., LLC*), Bankr. No. 09-11507-CAG, Adv. No. 11-01082-CAG, 2012 WL 195528, *7 (Bankr. W.D. Tex. Jan. 23, 2013).

[102] *In re Clear the Air, LLC*, 631 B.R. 286, 297 (Bankr. S.D. Tex. 2021).

[103] *Id.*

[104] ECF No. 1, pp. 15, 18, ¶¶ 85, 103.

owed more than $80 million to creditors including FedEx, and that at the very least the $44 million transfer created insolvency issues for the Debtor.[105]

In short, the alleged transfer involved parties that were all controlled by Frinzi, the note was given to the Debtor in exchange for $44 million only to legitimize the transfer rather than provide the Debtor with any real value, and all of this occurred during the Debtor's alleged insolvency. The Court finds this particular combination of transfer details and factual allegations surrounding the initial transfer is enough to survive a Rule 12(b)(6) motion under Rule 8(a)'s pleading requirements. It is plausible for the Court to infer that the Debtor's estate lost $44 million in funds in exchange for a note that was never intended to provide reasonably equivalent value to the Debtor. The Defendants' Motion is therefore **DENIED** on this point.

### D. The Defendants' Good Faith Subsequent Transferee Affirmative Defense

Next, the Court must address the Defendants' arguments regarding whether the Complaint triggers application of various affirmative defenses *on its face*. First, the Court will address whether the Trustee's claims under §§ 544 and 548 claims should be dismissed because the Complaint, on its face, establishes the good faith subsequent transferee affirmative defense under § 550(b)(1).

The Trustee contends that affirmative defenses are not a proper subject for a Rule 12(b)(6) motion.[106] However, even if the Defendants could assert a good faith subsequent transferee defense, the Trustee asserts 1Path was not a good faith subsequent transferee because it did not operate in good faith and did operate with sufficient knowledge as to Frinzi's ulterior and fraudulent motives in acquiring the OIS Division. The Trustee even goes as far to say that the

---

[105] *Id*. at pp. 15–16, ¶¶ 85–95.
[106] ECF No. 28, p. 19, ¶ 37.

Defendants "did the exact opposite, pressuring Frinzi to overpay exorbitantly for the OIS [D]ivision thanks to his lack of sophistication and due diligence."[107]

The Fifth Circuit made clear in *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA* that, "although dismissal under [R]ule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint."[108] Likewise, the bankruptcy court reiterated in *Black Elk Energy Offshore Operations* that not only does a defendant bear the burden of proving a § 550(b)(1) defense, but that the Fifth Circuit's *EPCO* holding "illustrates the high bar that a defendant must hurdle to show an affirmative defense on the face of the complaint."[109]

The Honorable Marvin Isgur emphasized in *Black Elk* that "there is a fine line between a complaint that fails to prove bad faith and a complaint that (taking all allegations as true) shows the Defendants received the transfers in good faith, for value, and without knowledge of voidability."[110] Judge Isgur underscored the slippery slope in creating a situation where the complaint "must plausibly show the affirmative defense does not apply,"—a rationale that "lacks any basis in the Federal or Bankruptcy Rules and requires that plaintiffs preemptively disprove affirmative defenses."[111]

Here, the Court finds a similar weakness with the Defendants' arguments, especially in the motion to dismiss context. The Defendants assert that the Trustee's Complaint establishes the "for value" prong of the § 550(b)(1) affirmative defense. This argument is based on the fact that the Trustee alleges at several points that Layer 7, on the Defendants' behalf, reached out to more than

---

[107] *Id*. at p. 21, ¶ 42.
[108] 467 F.3d 466, 470 (5th Cir. 2006).
[109] *In re Black Elk Energy Offshore Ops., LLC*, No. 15-34287, Adv. No. 19-3459, 2021 WL 346226, at *8 (Bankr. S.D. Tex. Feb. 1, 2021).
[110] *Id*.
[111] *Id*.

60 entities as part of a bidding process that ultimately resulted in a sale to AMRR for nearly $41 million. Although the Trustee alleges that the actual value of the OIS Division was nearly $20 million less than the purchase price, the Defendants contend they could assert an affirmative defense because the transfer, even if inflated, was still "for value" under § 550(b)(1).

However, the remainder of the Defendants' argument falters for the same reason as the defendants in *Black Elk*; the factual allegations in the Complaint do not show that the Defendants "lacked knowledge of the transfers' voidability."[112] In fact, much like *Black Elk*, the Complaint suggests the opposite. The Trustee alleges multiple times that the Defendants knew AMRR was a shell company through direct emails with Frinzi, knew of GNET's acquisition of AMRR, and at the very least had inquiry notice that Frinzi was potentially using an "unaffiliated entity's cash to fund a transaction for the benefit of himself and MGR."[113] At no point does the Complaint show that the Defendants lacked the knowledge necessary to raise a good faith transferee defense. The Court therefore finds that, while the Defendants may raise a § 550(b)(1) defense at a later stage in this case, the Complaint does not establish the elements necessary for them to succeed on it now.

Therefore, the Court declines to dismiss Counts 1–5 of the Trustee's Complaint as to the remaining Defendants, and the Motion on those counts is hereby **DENIED**.

### E.  Counts 6 and 7: the Defendants' Unclean Hands Affirmative Defense

 The Court now moves to the Defendants' second affirmative defense argument in relation to Counts 6 and 7, in which the Trustee alleges that the Defendants are liable under TUFTA §§ 24.005 and 24.006 for constructive fraudulent transfer. Here, the Trustee seeks avoidance—on behalf of the Debtor—based on the Debtor's "creditor" status as to the initial transfer between the

---

[112] *Id*.
[113] ECF No. 1, p. 13, ¶ 76.

Debtor and AMRR. In other words, the Trustee alleges that the Debtor is a creditor of AMRR, and that the note executed by AMRR to GNET was meant to be made payable to the Debtor but for Frinzi's mistake.

The Defendants' position here is essentially two-fold: (1) the Trustee has not plausibly alleged that the Debtor is in fact AMRR's "creditor"; and (2) even if the Debtor were, any claims brought under TUFTA would be barred by the unclean hands doctrine due to the Debtor's involvement in the fraudulent transfer.[114] The Trustee responds that, like the good faith subsequent transferee defense, the Complaint does not effectively establish the elements necessary to raise an unclean hands affirmative defense at a motion to dismiss stage.[115] As an initial matter, the Court agrees with the Trustee that it has plausibly alleged that the Debtor is in fact a "creditor." Texas law establishes that a "creditor" is simply a "person . . . who has a claim."[116] The Trustee has plausibly alleged a timeline that would indicate the Debtor's "right to payment" under Texas law through executing a $44 million transfer to AMRR.[117] Given that the Court must accept these allegations as true, the Debtor's "creditor" status is not a point of contention for the Court.

The application of the unclean hands doctrine is a slightly trickier issue. The Court recognizes and agrees to a certain extent with the Defendants that the Trustee is essentially pleading out of both sides of his mouth. The Complaint asks the Court to pay particular attention to the plethora of dubious actions Frinzi allegedly committed while he was the Debtor's CEO, but only to the extent that those actions benefit the Trustee's arguments. Frinzi is positioned as the ominous fraudster, and his ability to direct and maneuver the Debtor's funds while using the Debtor's accounts are documented throughout the Complaint. Yet, the Trustee simultaneously

---

[114] ECF No. 28, pp. 23–25, ¶¶ 45–50.
[115] *Id.*
[116] Tex. Bus. & Com. Code § 24.002(4).
[117] *Id.* at § 24.002(3).

asserts the Debtor is also just a benign creditor devoid of any agency or affiliation with Frinzi's actions.

It is well-established that under Texas law, the doctrine of unclean hands applies "against a litigant whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing."[118] Courts typically look for a plaintiff's "conduct *in connection with* the same matter or transaction [that] has been unconscientious, unjust, or marked by a want of good faith."[119] Application of the doctrine is a matter for the sound discretion of the court, and Texas courts have consistently held the doctrine to be founded on public policy and limited in application to "whether or not the public policy of the state will be best conserved by applying or refusing to apply it in a given case."[120]

The Trustee raises a slew of defenses to counter the Defendants' use of the unclean hands doctrine in this context: (1) the Defense does not appear on the face of the Complaint; (2) the doctrine would not apply to the Debtor's role as a creditor to the subsequent transfer between AMRR and the Defendants; (3) unclean hands is inapplicable against the Debtor because Frinzi's adverse actions would not be imputed to the Debtor; (4) even if the doctrine applied, the Defendants cannot show any injury caused by the Debtor's actions; and (5) it is a generally accepted practice in pleading standards for plaintiffs to use alternative theories and inconsistent facts to bring multiple causes of action.[121] While the Court may not be in lockstep with the Trustee as to the strength in each of these arguments, at the motion to dismiss stage it ultimately agrees.

---

[118] *GE Cap. Comm., Inc. v. Worthington Nat. Bank*, Civ. Action No. 3:09-CV-572-L, 2011 WL 5025153, at *4 (N.D. Tex. Oct. 20, 2011) (citation omitted) (internal quotations omitted).
[119] *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Pop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.— Houston [1st Dist.] 2015, no pet.) (emphasis added).
[120] *E.g.*, *Jackson L. Off., P.C. v. Chappell*, 37 S.W.3d 15, 27 (Tex. App.—Tyler 2000, pet. denied).
[121] ECF No. 28, pp. 23–25, ¶¶ 45–50.

This determination can be made solely by focusing on the Trustee's first argument. It is clear to the Court that the unclean hands defense does not appear on the face of the Complaint. It is important to note once again what would be required to meet the "high bar" for a party's claim to allege all of the facts necessary to show an affirmative defense on the face of a complaint. In *EPCO*, the Fifth Circuit reversed a dismissal based on a statute of frauds affirmative defense because, while the complaint did not specifically allege the parties had signed a written document or that the plaintiff had accepted the contract, dismissal on a statute of frauds basis was improper given that neither scenario was "foreclosed by the face of [the plaintiff's] pleadings."[122]

The Defendants raise strong arguments regarding the fact that, throughout the Complaint, the Trustee alleges actions taken by Frinzi while in an executive role for the Debtor. This includes bidding to buy the OIS Division from the Defendants, directing the Debtor to quit making payments of nearly $80 million to help accumulate the funds needed to execute the OIS Division purchase, and transferring money from the Debtor's accounts to AMRR to finalize the purchase.

However, just like *EPCO*, nothing in the Complaint forecloses a factual scenario that equally shows Frinzi acting outside of his principal-agent relationship on behalf of the Debtor. In fact, at two specific points, the Trustee alleges not only that "Frinzi's interest in the deal was not necessarily the same as the interest of Genesis or the Debtor," but that neither Layer 7 nor the Defendants "ever heard anything else [regarding the OIS bidding process] from Bock, the Debtor, or Genesis until after the sale of the OIS [D]ivision to Frinzi."[123] While the Defendants may be ultimately able to counter that all of Frinzi's actions were on behalf of the Debtor, and therefore his actions and knowledge of the initial transfer from the Debtor to AMRR should be imputed to the Debtor, the Complaint, on its face, does not establish that as the *only* plausible conclusion.

---

[122] *EPCO*, 467 F.3d at 470–71.
[123] ECF No. 1, p. 9, ¶¶ 48, 51.

At the motion to dismiss stage, the Court cannot definitively hold that the facts alleged should be imputed to the Debtor for unclean hands purposes. Therefore, the Court **DENIES** the Defendants' Motion to Dismiss on Counts 6 and 7.

### F.  Count 8: Attorney's Fees

Finally, the Court addresses the Trustee's separate claim for attorney's fees. The Trustee essentially argues in the negative, contending that just because Bankruptcy Rule 7008 no longer requires attorney's fees to be a separate cause of action since the 2014 amendments, the Bankruptcy Rules do not prohibit such a claim either.[124]

Here, the Court agrees with the Defendants that attorney's fees are a form of relief, not an independent cause of action, and that a dismissal of a standalone action for attorney's fees does not preclude the possibility of recovery of attorney's fees at trial.[125] As the Trustee points out, in the amendments to Bankruptcy Rule 7008's in 2014, the separate cause of action requirement was for attorney's fees was removed, and the Court finds these amendments instructive.[126] Dismissing this particular claim not only consolidates the issues in this matter, but does no harm to the Trustee's ability to recover those fees at trial.

Therefore, the Defendants' Motion is **GRANTED** as to Count 8.

### G.  The Trustee's Motion for Leave to Amend

The Trustee has requested leave to amend under Rule 15(a)(2) if it has failed to sufficiently plead any element or cause of action.[127] Rule 15 provides that parties should be granted leave to

---

[124] ECF No. 28, p. 18, ¶ 33.
[125] *Curtis v. Cerner Corp.*, 621 B.R. 141, 180 (Bankr. S.D. Tex. 2020).
[126] *See* Fed. R. Bankr. 7008 advisory committee's note to 2014 amendment ("The rule is amended to delete subdivision (b), which required a request for attorney's fees always to be pleaded as a claim in an allowed pleading. That requirement, which differed from the practice under the Federal Rules of Civil Procedure, had the potential to serve as a trap for the unwary.").
[127] ECF No.28, p. 25, ¶ 51.

amend "freely" when justice so requires.[128] This principle "supports the general policy of the
Federal Rules that litigation should test the merits of claims, not the technical skill of pleadings."[129]
The Fifth Circuit has made clear that "Rule 15(a) 'evinces a bias in favor of granting leave to
amend.'"[130] A court's discretion to deny has been consistently defined as "misleading."[131] Courts
should grant leave to amend "absent a 'substantial reason' such as undue delay, bad faith, dilatory
motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party."[132]

There is no substantial reason to deny the Trustee's leave to amend. In light of the
procedural history of the case and given that the parties are still at the pleadings stage of litigation,
there is no indication the Defendants would be subjected to undue delay. The Defendants have also
not raised any notion of bad faith or a dilatory motive on behalf of the Trustee, and have only
generally requested the Trustee's request be denied given that informal discovery has taken
place.[133]

As previously stated, the Complaint adequately alleges that the MSouth, 1Path, and
Onepath Defendants were connected in a single "enterprise." The Trustee did nothing to show how
the dismissed Defendants were similarly connected to that same structure. Repleading as to the
dismissed Defendants is not incurable, and there are no previous amendments by the Trustee.
Should the Trustee seek to amend his Complaint, the Trustee's Motion to Amend is hereby
**GRANTED**.

For the reasons set forth above, it is hereby

---

[128] Fed. R. Civ. P. 15(a)(2).
[129] *In re Elcoteq, Inc.*, 521 B.R. 189, 203 (Bankr. N.D. Tex. 2014) (Houser, J.).
[130] *Smith v. EMC Corp.*, 393 F.3d 590, 598 (5th Cir. 2004) (citation omitted).
[131] *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004).
[132] *Id.*
[133] ECF No. 30, p. 8.

**ORDERED** the Defendants' Motion to Dismiss is **GRANTED** in part with respect to all claims against Defendants Bluewave Computing, LLC; Direct Resources, LLC; Internet & Telephone, LLC; Paradigm Computer Consulting, Inc.; and Unknown Shareholders of Paradigm Computer Consulting, LLC. However, the Court grants the Trustee's Alternative Motion for Leave to Amend pursuant to Rule 15(a) of the Federal Rules of Civil Procedure; it is further

**ORDERED** that the Defendants' Motion to Dismiss is **DENIED** with respect to Counts 1–5 for actual and constructive fraudulent transfer under § 548 of the Bankruptcy Code, and §§ 24.005(a)(1)–(a)(2) and 24.006(a) of TUFTA through § 544(b)(1) of the Bankruptcy Code; it is further

**ORDERED** that the Defendants' Motion to Dismiss is **DENIED** with respect to Counts 6 and 7 for constructive fraudulent transfer as a creditor under §§ 24.005(a)(2) and 24.006(a) of TUFTA; it is further

**ORDERED** that Defendants' Motion to Dismiss is **GRANTED** with respect to Count 8 against all Defendants for recovery of attorney's fees as an independent cause of action, but does not foreclose the Trustee's right to seek attorney's fees as part of another independent cause of action; and it is further

**ORDERED** that the Trustee's Motion to Amend under Rule 15(a) is **GRANTED** with any amendment being due within sixty (60) days of this Order.

### ### END OF ORDER ###